1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

JOHN DOE,

          Plaintiff,

     v.

WILLIAM P. BARR, *et al.*,

          Defendants.

Case No.  20-cv-02263-RMI

**ORDER RE: PETITIONER'S MOTION
FOR TEMPORARY RESTRAINING
ORDER; DIRECTIONS TO THE
PARTIES**

Re: Dkt. No. 13

Now pending before the court is Petitioner's Motion (dkt. 13), filed April 6, 2020, for a
temporary restraining order, by which he seeks an order releasing him from immigration detention
at the Yuba County Jail. Respondents have filed a Response (dkt. 18) expressing their opposition,
and Petitioner has filed a Reply (dkt. 19). Further, in addition to a jointly-filed Statement of
Recent Decision (dkt. 28), both Petitioner and Respondents have filed supplemental declarations
(*see* dkts. 19-1, 23-1, 26-1, 29-1) as well as filing objections to the opposing party's supplemental
filings (*see* dkts. 22, 24, 29-2). Having read and considered all of the Parties' filings, the court
rules as follows.

**BACKGROUND**

Petitioner was born in El Salvador in 1992, and entered the United States in 2014 seeking
asylum after members of the transnational criminal syndicate known as the 18th Street gang, or
Mara 18, attempted to shoot him to death. *See* Pet. (dkt. 1) at 7-8. As a young child, Petitioner
suffered severe beatings and other forms of abuse from his mother, as well as suffering sexual
abuse by his mother's friends. *Id*. at 8. When he was 10 years old, Petitioner was a witness to the
shooting and attempted murder of his stepfather at the hands of Mara 18 members; and,

United States District Court
Northern District of California

1    subsequently, Petitioner testified against them in court. *Id*. After becoming the victim of

2    harassment, and being labeled a "snitch," Petitioner was shot by members of the Mara 18

3    organization. *Id*. During his recovery from that episode, Petitioner began to consume alcohol to

4    excess in an effort to abate his physical and emotional pain. *Id*. Due to his fear of continued

5    persecution, Petitioner left El Salvador and came to the United States in search of asylum in early

6    2014. *Id*. Once in the United States, and having met his wife here, Petitioner nevertheless

7    continued to suffer from alcohol dependency which resulted in two criminal convictions for public

8    intoxication, a domestic violence conviction, as well as a conviction for going to his wife's house

9    on one occasion in violation of a protective order. *Id*. at 9. In early January of 2016, having

10   already been taken into pretrial custody for these offenses, Petitioner was convicted of all four

11   offenses, and was given a cumulative time-served sentence of 65 days. *Id*. Thereafter, Petitioner

12   was transferred to immigration custody, under which he has been kept in an incarcerated state. *Id*.

13   at 2, 9.

14          Over the last four years, immigration authorities have kept Petitioner in confinement at

15   three different detention facilities, between which they have transferred him six times. *Id*. at 14.

16   During this time, Plaintiff has been jailed at the Rio Consumnes Correctional Center (a primary

17   custody facility for inmates sentenced to county jail by the Sacramento County courts), at the

18   Mesa Verde Detention Facility (a detention and processing facility operated by federal

19   immigration authorities), and most recently, at the Yuba County Jail. *See id*. at 14. During this

20   four-year period while Respondents have kept Petitioner incarcerated, his immigration case has

21   repeatedly bounced back and forth between the dockets of several immigration judges and the

22   Board of Immigration Appeals ("BIA"). *Id*. at 10-14. The BIA has remanded Petitioner's case, due

23   to legal errors committed by these various immigration judges, on three separate occasions,

24   namely, in September of 2017, in October of 2018, and in February of 2020. *Id*. at 12-13. During

25   the four-year period while his asylum case has been pending before the various tribunals operated

26   by immigration authorities, Petitioner's repeated requests for release from jail custody have been

27   denied on the basis that his 2016 convictions for public intoxication, domestic violence, and the

28   violation of a protective order all combine to render him a flight risk as well as a danger to the

2

community. *Id*. at 10-14. In his current setting of confinement, the Yuba County Jail keeps Petitioner locked in his cell for nearly 19 hours per day, a state of incarceration which is exasperated by shortages of basic necessities such as soap and toilet paper. *Id*. at 3, 16. Due to currently ongoing shortages and scarcity, Plaintiff "sometimes has to go a week without toilet paper . . . [and] cannot afford to buy basic hygiene necessities such as soap and shampoo." *Id*. at 16.

As a result of the abuse and violence that Petitioner suffered in his childhood years, in addition to the attempts on his life and that of his stepfather, Petitioner has been diagnosed as suffering from a severe and chronic case of posttraumatic stress disorder ("PTSD"). *Id*. at 8. During the four years that immigration authorities have kept Plaintiff incarcerated at various jails, his mental health has steadily deteriorated and he has been further diagnosed as suffering from major depressive disorder with psychotic features and severe anxiety. *Id*. Petitioner's symptoms manifest themselves in the form of flashbacks, nightmares, acute hopelessness, auditory hallucinations, panic attacks, insomnia, restlessness, dramatic mood swings, pervasively negative thought content, uncontrollable crying, and chronic suicidality that resulted in at least three suicide attempts, between 2017 and 2020, while in jail custody. *Id*. at 8, 15, 17. In this regard, a recent psychological evaluation resulted in the conclusion that Petitioner "is at extremely high risk of future [suicide] attempts if he continues to be in custody," because of the fact that he has reached the very "edge of his capacity to emotionally cope with his current situation." *Id*. at 15. Another mental health professional has opined that the degree and severity of Petitioner's psychiatric disorders "are associated with levels of disability and impaired functioning [that are] as severe as congestive heart failure and liver failure." *Id*. at 17. The severity of Petitioner's psychiatric symptoms – such as his uncontrollable crying, inability to speak, and other intrusive symptoms – have not only inhibited his ability to communicate with his attorneys such that he can meaningfully participate in his immigration case, but have also seriously interfered with his ability to communicate with doctors. *Id*. at 18.

Consequently, several medical experts have opined that Petitioner requires intensive inpatient psychiatric treatment for the stabilization of his mental health. *Id*. at 19-20. Specifically,

1    two mental health professionals have opined that Petitioner's condition is indeed amenable to

2    treatment, and that his mental health prognosis would be strong if he were to undergo an evidence-

3    based and trauma-informed psychosocial and pharmacological treatment regimen. *Id*. at 19.

4    Specifically, one mental health expert has opined that in order to stabilize Petitioner's condition

5    and restore him to good mental health, Petitioner requires "clearly defined treatment protocols that

6    are completely different from the generic and infrequent supportive therapy" that is documented in

7    Petitioner's medical records from the last four years in the above-mentioned jails. *Id*. As a result of

8    his deteriorated state of mental health, combined with his history of alcohol dependency and

9    abuse, a medical doctor has opined has Petitioner "is particularly vulnerable to COVID-19

10   infection and at increased risk of developing COVID-19 complications including death." *See*

11   Keller Decl. (dkt. 1-3) at 130-31. Dr. Keller based this opinion not only on Petitioner's history of

12   alcohol dependency and abuse, but also because Petitioner "suffers from prolonged and extremely

13   high levels of psychological distress . . . [placing him] at further risk of having a suppressed

14   immune system, putting him at higher risk than the general population of contracting and

15   potentially having more serious infections . . . [because] [s]tress and its link to immunosuppression

16   are well documented in the medical literature." *Id*. at 131. Accordingly, in the event of his release

17   from jail custody, Petitioner's counsel has arranged for Petitioner to be admitted for inpatient

18   treatment at the Psychiatric Emergency Department of San Francisco General Hospital (*see* Pet.

19   (dkt. 1) at 19), where space continues to be available for him and where significant and substantial

20   social distancing and other protocols pertaining to COVID-19 are in place. *See* Portnoy Decl. (dkt.

21   29-1) at 3-5.

22                                    **LEGAL STANDARD**

23           The standard for issuing a temporary restraining order is the same as for issuing a

24   preliminary injunction. *See Dumas v. Gommerman*, 865 F.2d 1093, 1095 (9th Cir. 1989). Under

25   the traditional test, a movant must show: (1) a strong likelihood of success on the merits; (2) the

26   *possibility* of irreparable injury if preliminary relief is not granted; (3) a balance of hardships

27   favoring the movant; and (4) the advancement of the public interest (at least in certain cases). *See*

28   *Taylor v. Westly*, 488 F.3d 1197, 1200 (9th Cir. 2007). The Supreme Court, however, has more

United States District Court
Northern District of California

recently held that a movant seeking an injunction must demonstrate that irreparable harm is in fact "likely," not merely possible. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008). Because a preliminary injunction is an extraordinary remedy and never awarded as a matter of right, in each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief; thus, in the exercise of such discretion, courts of equity should pay particular attention to the public consequences of employing the extraordinary remedy of injunction. *Winter*, 555 U.S. at 24.

Furthermore, because Petitioner seeks a mandatory injunction, he must establish that the law and facts clearly favor his position, not simply that he is likely to succeed – this is so because the release order sought by Petitioner here would operate to order Respondents to take the affirmative action of releasing him from his current state of incarceration in their custody. *See e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Accordingly, because such an injunctive order would go well beyond simply maintaining the *status quo pendente lite*, it is particularly disfavored, and district courts have been instructed to deny such relief unless the facts and law clearly favor the moving party. *Id.* (citing *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979); and, *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011)).[1]

## DISCUSSION

Because of the spread of COVID-19, there is a global pandemic afoot that has thus far

---

[1] It should also be noted, perhaps as an aside or a curiosity, that while some authorities have concluded that district courts possess an inherent power to admit habeas petitioners to bail pending the resolution of their cases, other courts have found this disagreeable. *See Mapp v. Reno*, 241 F.3d 221, 226 (2nd Cir. 2001) ("Today we reaffirm these cases and hold, once again, that the federal courts have inherent authority to admit to bail individuals properly within their jurisdiction. Even as we have acknowledged the authority of the federal courts to grant bail to habeas petitioners, however, we have also, and consistently, emphasized that this power is a limited one, to be exercised in special cases only. [A] habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective.") (internal quotations and citation omitted); *see also Roe v. United States Dist. Court (In re Roe)*, 257 F.3d 1077, 1080 (9th Cir. 2001) (Stating that "the question of whether the federal courts have inherent power to grant bail in any case where they may properly assert jurisdiction . . . has divided the federal courts for over a century . . . [and] [w]e need not, and specifically do not, resolve this issue today . . .").

been known to cause more than one million infections and more than 56,300 deaths in the United States alone, with there being no indication that the spread of infection has reached its peak.[2] In California, as in other states, a state of emergency has been declared and all persons have been ordered to stay at home and to practice social distancing at all times.[3] Likewise, the CDC has issued nationwide guidance to the following effect: there is no vaccine to protect against COVID-19; people can be infected by mere proximity with infected persons (who may be asymptomatic); people should stay at home as much as possible and avoid coming into proximity with others whenever possible; people should wear cloth face coverings or masks in public settings and should wash their hands with soap and water as often as possible; people should practice social distancing to the greatest extent possible; and, while everyone is at risk of contracting COVID-19, older adults and persons of any age who have serious underlying medical conditions may be at higher risk for more severe illness.[4] Furthermore, as mentioned above, there is undisputed evidence in the record that Petitioner's PTSD and MDD have likely caused him to become immunocompromised and that people with a weakened immune system have a reduced ability to fight infectious diseases in general, including viruses like COVID-19. *See* Keller Decl. (dkt. 1-3) at 130-31.[5] While Respondents appear to tacitly concede that social distancing is not possible at the Yuba County Jail (*see* Respondents' Opp. (dkt. 18) at 23, "Even assuming there were (sic) a lack of social distancing at YCJ . . ."), Respondents submit that they have implemented a number of COVID-19 related remedial measures at Yuba County, including releasing a number of inmates, instituting a 14-day quarantine for new prisoners, temperature checks, cancellation of all social visits, discouraging attorney contact visits, and providing instructions on handwashing as well as "other

---

[2] *See* Website of the Centers for Disease Control and Prevention ("CDC"): https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last checked April 26, 2020, at 4:00 pm).

[3] *See* Cal. Executive Order N-33-20: https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (last checked April 26, 2020 at 4:00 pm).

[4] https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last checked April 26, 2020, at 4:00 pm).

[5] *See also* CDC Website: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#immunocompromised (last checked, April 26, 2020, at 4:30 pm).

1    health and wellness information by video for detainees . . ." *Id*. at 12-13. However,

2    notwithstanding the measures taken by Respondents, the fact remains that social distancing and

3    facial coverings are not a reality inside the Yuba County Jail; indeed, as recently as two weeks

4    ago, the Sheriff was reported to have issued a plea to the general public for the donation of 1,000

5    face coverings for his jail such as to protect people against COVID-19.[6]

6        In opposing the motion, Respondents advance a series of threshold arguments. First,

7    Respondents contend that this court lacks jurisdiction over the Petition because of the notion that

8    the proper respondent would be Petitioner's immediate custodian, the Sheriff of the Yuba County

9    Jail (situated in the Eastern District of California), as opposed to Respondents David Jennings

10   (San Francisco Field Office Director for Immigration and Customs Enforcement, "ICE"), Matthew

11   Albence (Acting ICE Director), Chad Wolf (Acting DHS Secretary), and William Barr (United

12   States Attorney General). *See* Respondents' Opp. (dkt. 18) at 15-16. The flaw in Respondents'

13   argument is evident in the fact that the Sheriff of Yuba County, Petitioner's *actual custodian*,

14   neither has the authority to release Petitioner from the Attorney General's *legal custody*, nor any

15   interest whatsoever in being held to answer the claims raised in the Petition.

16       Because the federal habeas statute provides that the proper respondent to a habeas petition

17   is "the person who has custody over" the petitioner (*see* 28 U.S.C. § 2242), the generally

18   applicable "default rule is that the proper respondent is the warden of the facility where the

19   prisoner is being held, not the Attorney General or some other remote supervisory official,"

20   (*Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004)); however, this is not always the case in the

21   immigration context. In the immigration context, it may be said that the "immediate custodian"

22   rule does not always control, and that its applicability would sometimes depend on whether the

23   petitioner is challenging the present physical detention (sometimes referred to as a "core" habeas

24   challenge) or other statutory or constitutional violations (a "non-core" habeas challenge). *See*

25   *generally Villavicencio Calderon v. Sessions*, 330 F. Supp. 3d 944, 951-53 (S.D.N.Y. 2018). In the

26   case of non-core habeas challenges, some courts have held that the proper respondent is a person

27

28   _____
     [6] *See* https://www.davisvanguard.org/2020/04/exclusive-yuba-county-jail-ice-detention-center-sheriff-
     pleas-for-donated-face-coverings/ (last checked April 26, 2020, at 4:45 pm).

United States District Court
Northern District of California

or entity that has *legal custody* of the petitioner, also known as a "legal custodian." *See e.g.*, *Somir v. United States*, 354 F. Supp. 2d 215, 217-19 (E.D.N.Y. 2005). In the immigration context, similar rulings have issued for core habeas challenges. *See e.g.*, *Farez-Espinoza v. Chertoff*, 600 F. Supp. 2d 488, 495 (S.D.N.Y. 2009) ("Because Farez-Espinoza is being held by the Government – i.e., the Attorney General and DHS – and not the warden of the prison in which Farez-Espinoza currently is detained, I find that Respondents Secretary Chertoff and Attorney General Mukasey are properly named in the instant petition."); *see also Castillo-Hernandez v. Longshore*, 6 F. Supp. 3d 1198, 1208 (D. Colo. 2013) (Stating that in both iterations of *Armentero v. INS*, 340 F.3d 1058, 1059-60 (9th Cir. 2003) (*Armentero I*), *reh'g granted*, *opinion withdrawn*, 382 F.3d 1153 (9th Cir. 2004), *opinion after grant of reh'g*, 412 F.3d 1088 (9th Cir. 2005) (*Armentero II*), "the government argued that the immediate custodian rule did not apply and a local ICE [Field Office Director] was a proper respondent, now the government suggests that the rule does apply and the ICE FOD is an improper party . . . the government's novel position on this question appears in tension with the relevant regulations . . . [that] authorize the ICE District Director, not the immediate custodian, to exercise his or her discretionary judgment to release noncitizens whose prolonged detention might violate the Constitution.") (citing 8 C.F.R. § 1236.1(c)(6)(i) & (ii)); *see also Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1187 (N.D. Cal. 2017) ("*Padilla* instructs courts not to [only] look to the official who exercises [ultimate] legal control over the petitioner where present physical confinement is at issue . . . At least where a readily identifiable federal official exercises more immediate control over a contract facility than the Attorney General or another department head, as is the case here, *Padilla* requires a petitioner challenging present physical custody to name that more immediate official . . . [thus] [b]ecause [Field Office Specialist Elicia] Smith is the proper respondent, this Court has habeas jurisdiction over A.H.'s habeas petition. So long as the proper respondent falls within this Court's territorial jurisdiction, habeas jurisdiction exists. [] No party disputes that Elicia Smith is based in San Francisco, within this Court's territorial jurisdiction.") (internal citations omitted).

Here, the court agrees with Petitioner (*see* Petitioner's Reply (dkt. 19) at 9-10) that it is clear that the power over Petitioner's state of incarceration is vested in the legal custodians named

as respondents rather than the Sheriff of Yuba County. First, the Yuba County Jail's involvement here is merely to provide a service to ICE, and it is undisputed that Petitioner cannot be released without the express authorization of ICE; thus, ICE is in complete control of Petitioner's admission into and release from the Yuba County Jail. With all due respect to the warden of the Yuba County Jail, the fact that this jail has agreed to house federal immigration detainees for the federal authorities renders the warden of this facility as a mere functionary, no different than an individual jailor posted outside Petitioner's cell block. Second, it goes without saying that the Sheriff of Yuba County is ill-placed to respond to the merits of the claims underlying the habeas petition at bar because the Sheriff would not be in possession of the information necessary to answer on behalf of federal immigration authorities, nor does the Sheriff have any legitimate interest in litigating these claims. Thus, while in the great majority of habeas cases, or at least those which involve prisoners held in penal institutions, the immediate custodian rule makes sense, it cannot be argued with any seriousness that when the warden of a detention facility has no literal power to produce the petitioner, and cannot provide any meaningful answers to important factual and legal questions, that nevertheless courts should apply the immediate custodian rule and drive the litigation into a dead-end for no legitimate reason and to the benefit of no party. Lastly, it should not go without mention that by detaining immigration prisoners in remote jail facilities belonging to various counties and then urging the application of the immediate custodian rule, it at least appears that Respondents may be attempting to take advantage of the immediate custodian rule to frustrate Petitioner's effective access to habeas corpus litigation. In short, Respondents' argument regarding this inappropriate application of the immediate custodian rule seeks to place Petitioner in a catch-22, where he can neither find habeas corpus jurisdiction in the district in which he is confined, nor elsewhere. Accordingly, based on the above-referenced authorities, because Respondent David Jennings, the San Francisco Field Office Director for ICE, is both within this district and vested with discretionary authority to release Petitioner, he is a proper respondent, and the court concludes that the immediate custodian rule does not apply in this case and that at least one of the named respondents can provide Petitioner with the requested discretionary relief. Thus, the government's argument that this court lacks jurisdiction over the

1    Petition is without merit. *See e.g., Carmona v. Aitken*, No. 14-cv-05321-JSC, 2015 U.S. Dist.

2    LEXIS 47772 at *17, 2015 WL 1737839, *2-*5 (N.D. Cal. Apr. 10, 2015) (reasoning that the

3    immediate custodian rule did not apply to habeas petitions filed by an immigrant detainee; rather,

4    the proper respondent should be one with actual authority to effectuate the prisoner's release, such

5    as the Attorney General, or the Department of Homeland Security Secretary).

6            Respondents have also advanced the argument that Petitioner's due process claim relating

7    to his present confinement in the Yuba County Jail during the circumstances presented by the

8    currently pending pandemic fails to establish Article III standing because Petitioner has not

9    established an injury in fact or redressability. *See* Respondents' Opp. (dkt. 18) at 22-25. The court

10   disagrees. Regarding standing, Respondents essentially argue that Petitioner does not presently

11   suffer from COVID-19 infection, and that his likelihood of becoming infected is speculative. *See*

12   *id*. at 22-23. However, COVID-19 infections are still rapidly increasing throughout the United

13   States, including in California; and, when introduced into a confined area, such as a jail, a cruise

14   ship, or a naval vessel, the infection can spread rapidly. Indeed, one model produced by a data

15   scientist maintains that if a single person, either staff or inmate, were to be infected with COVID-

16   19 at the Yuba County Jail, nearly every other person who is either employed or imprisoned there

17   would be affected within a matter of weeks. *See* Moussavian Decl. (dkt. 19-1) at 7.[7] In fact, it

18   appears that Petitioner is currently detained in a pod with a fellow prisoner who may be showing

19   signs of COVID-19 infection in the form of fever and headaches. *See* Petitioner's Reply (dkt. 19)

20   at 7 (citing Moussavian Decl. (dkt. 19-1) at 5). Under the circumstances described herein,

21   including the fact that Petitioner is immunocompromised and requires intensive inpatient

22   psychiatric care, the court finds that Petitioner has standing to assert his claims. *See also*

23   Petitioner's Reply (dkt. 19) at 8 ("Respondents claim that Mr. Doe does not meet any of the

24   CDC's "high-risk criteria" [] [y]et, Mr. Doe's Yuba medical records confirm he has taken an anti-

25

26   ───────────────

27   [7] The court will note that in making the findings enumerated herein, the court has considered hearsay
     evidence offered by Petitioner and by Respondents. *See Flynt Distrib. Co. v. Harvey*, 734 F. 2d 1389, 1394
     (9th Cir. 1984) (a district court does not err by considering hearsay evidence offered in connection with a

28   motion for preliminary injunction; because a "trial court may give even inadmissible evidence some weight
     when [doing] so serves the purpose of preventing irreparable harm before trial.")

1    depression medication with a side-effect of a weakened immune system, at the direction of a Yuba

2    doctor, since January 6, 2020."). Thus, it is not necessary for Petitioner to either become infected

3    with COVID-19, or to propose release conditions that would guarantee the impossibility of a

4    future infection in order to establish an injury in fact or redressability. Once again, Respondents'

5    argument appears to place Petitioner in a catch-22, such that Petitioner's claim is urged to be

6    viewed as failing to establish standing until such time as it is too late and Petitioner becomes

7    infected and the claim becomes moot. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

8    *(TOC), Inc.*, 528 U.S. 167, 190-91 (2000) ("if mootness were simply "standing set in a time

9    frame," the exception to mootness that arises when the defendant's allegedly unlawful activity is

10   "capable of repetition, yet evading review" could not exist . . . [the] [s]tanding doctrine functions

11   to ensure, among other things, that the scarce resources of the federal courts are devoted to those

12   disputes in which the parties have a concrete stake.").

13          Turning to Respondent's argument to the effect that Petitioner has failed to establish a

14   likelihood of success on the claim that his civil detention in the Yuba County Jail, given his

15   immunocompromised condition during the time of a viral pandemic, violates due process –

16   Respondents submit that "Petitioner's continued immigration detention cannot be described as

17   punitive or excessive in relation to the legitimate government purposes of protecting the public

18   and assuring his presence at removal." *See* Respondents' Opp. (dkt. 18) at 25-26. In this regard,

19   the court begins by noting that it is well established that "federal habeas corpus actions are []

20   available to deal with questions concerning both the duration and the conditions of confinement."

21   *See Workman v. Mitchell*, 502 F.2d 1201, 1208 n.9 (9th Cir. 1974). As to Petitioner's likelihood of

22   success on the merits, one of Petitioner's claims, as noted above, is that his conditions of

23   confinement in the Yuba County Jail, in light of the ongoing COVID-19 pandemic, are

24   unconstitutional. *See generally* Pet. (dkt. 1).  In evaluating a claim that a detainee's conditions of

25   confinement are unconstitutional, "the proper inquiry is whether those conditions amount to

26   punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Conditions that rise to the level of

27   punishment, occur "(1) where the challenged restrictions are expressly intended to punish, or (2)

28   where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless

1    excessive in relation to the alternative purpose, or are employed to achieve objectives that could be

2    accomplished in . . . alternative and less harsh methods." *See Jones v. Blanas*, 393 F.3d 918, 932

3    (9th Cir. 2004) (internal quotations and citations omitted). Here, Petitioner does not assert that

4    Respondents intend to punish him by detaining him under the conditions described above; nor

5    does he dispute Respondents' asserted purpose and basis in detaining him at the Yuba County Jail

6    – that is, specifically, to ensure his presence at immigration proceedings and to effectuate the

7    government's ability to execute any final orders of removal. Thus, the actual issue here is whether

8    Petitioner is likely to prevail in demonstrating that, given his alleged health concerns, his detention

9    is excessive when compared to the government's asserted needs and basis for so detaining him.

10   Here, the court finds that Petitioner has indeed shown a clear likelihood of success on the merits,

11   and that in light of Petitioner's health issues, and the ongoing pandemic, his incarceration in the

12   Yuba County jail is excessive, and that (as discussed below) the government's needs can be

13   addressed with less excessive means than outright incarceration in a county jail.

14         Because the court finds that Petitioner has clearly shown that he is immunocompromised

15   and stands at high risk of severe illness or death if infected with COVID-19, and because

16   Petitioner has clearly demonstrated that he cannot practice meaningful social distancing in the

17   Yuba County Jail, although it is likewise undisputed that Respondents have a non-punitive

18   purpose in detaining him as such (namely, to ensure his appearance at immigration proceedings

19   and to effectuate any final orders of removal), the court finds that Petitioner has made a strong

20   showing that Respondents' detaining him in the above-described conditions, in spite of their

21   knowledge of his high-risk status, is indeed "excessive in relation to [the stated] purpose." *See id*.

22   The court, therefore, finds that a clear showing has been made that Petitioner is likely to succeed

23   on the merits of his Fifth Amendment claim. As to the question of whether Petitioner has

24   demonstrated a likelihood of irreparable harm, the court will note that this virus is thought to

25   spread mainly from person-to-person through respiratory droplets produced when an infected

26   person coughs, sneezes, or even speaks or breathes, and that these droplets can land in the mouths

27   or noses of people who are nearby or be launched into the air and inhaled into someone's lungs, or

28

United States District Court
Northern District of California

12

land on a surface that may then be touched by someone who in turn touches their eyes or mouth.[8] Moreover, the court finds that Petitioner has made a clear showing that by virtue of his incarceration in the Yuba County Jail, he is prevented from meaningfully, if at all, adhering to the advice of our Nation's health officials, including those at the CDC, as to how to avoid becoming infected with COVID-19, specifically, by engaging in a strict regimen of social distancing at all times, by using protective equipment such as masks and gloves when in close proximity to others, and to frequently wash one's hands after touching surfaces or objects with which others have come into proximity. Under these circumstances, the court finds that Petitioner has made a sufficiently clear and compelling showing that he occupies a high degree of risk that he would suffer severe illness or death if infected with COVID-19; and, thus, the court finds that Petitioner is likely to incur irreparable injury in the absence of any relief from the present conditions of his confinement at the Yuba County Jail.

Further, the court finds that the balance of hardships tips in Petitioner's favor because of his inability to meaningfully limit his exposure to COVID-19 while he is confined at the Yuba County Jail. Although Respondents may have concerns about a risk of flight, or other matters, the court intends to address those concerns by imposing reasonable conditions upon release (described below). Finally, the court finds that under the highly unusual circumstances presented by the presence of a global pandemic – the likes of which has not been seen in over a century – the public interest is indeed better served by granting the requested injunction than otherwise would be the case. In particular, the court finds that granting the requested TRO better serves the public's interest in promoting and preserving the overall public health by an effort to contain the further spread of COVID-19, particularly in detention centers, which are typically staffed by numerous individuals who reside in nearby communities. Accordingly, the court will conditionally grant Petitioner's motion, as described below, pending the formulation of a forthcoming release order that would contain reasonable conditions of release.

//

---

[8] See https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf (last checked, April 27, 2020, at 1:30 pm).

United States District Court
Northern District of California

**CONCLUSION**

As mentioned above, the court will not order Petitioner to be released without reasonable conditions to include:

(1) Petitioner is to reside and shelter in place at an address to be specified in said order. Petitioner's counsel is to provide each proposed address (including any address for the proposed inpatient treatment facility and any proposed address of residence after discharge from such inpatient treatment facility) where Petitioner shall shelter in place.

(2) Petitioner shall be transported from the Yuba County Jail to said address by a person to be specified in said order (the name of such person shall be provided by Petitioner's counsel).

(3) Pending further order of the court, Petitioner shall not leave said address or addresses where he will shelter in place, except to obtain medical care, to appear at court proceedings, or to obey any orders issued by the Department of Homeland Security.

(4) Petitioner shall not violate any federal, state, or local laws or ordinances.

Additionally, counsel for the Parties are **ORDERED** to meet and confer by whatever means of their choosing forthwith, and counsel shall propose, in a joint statement to be filed no later than Wednesday, April 29, 2020 at 12:00 p.m., any additional reasonable condition that they believe should attend Petitioner's release.

**IT IS SO ORDERED.**

Dated: April 27, 2020

ROBERT M. ILLMAN
United States Magistrate Judge