UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>          Plaintiff,<br><br>   v.<br><br>WILLIAM P. BARR, et al.,<br><br>          Defendants. | Case No. 20-cv-02263-RMI<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

In early April of 2020, Petitioner, an asylum seeker, filed a habeas corpus petition as well as a motion for a temporary restraining order ("TRO") seeking his immediate release from the custody of Immigration and Customs Enforcement ("ICE") at the Yuba County Jail. *See* Pet. (dkt. 1); and, Pet.'s Mot. (dkt. 13). Following a round of briefing by the parties, the court granted Petitioner's motion for a temporary restraining order (dkt. 31) and ordered Respondents to release Petitioner (dkt. 33) from custodial confinement at the Yuba County Jail pursuant to a series of conditions of release. Thereafter, at a hearing on May 5, 2020, the court ordered Respondents to show cause as to why a preliminary injunction should not issue, for which the parties stipulated to a briefing schedule (dkts. 40, 43). In addition to Petitioner's brief (dkt. 48) and exhibits (dkt. 53) in support of the issuance of a preliminary injunction, now pending before the court are the Respondents' supplemental brief in opposition (dkt. 44), along with various declarations and exhibits (dkts. 45, 46), as well as Respondents' reply brief (dkt. 51). Having read and considered the parties' written submissions, the court rules as follows.[1]

---

[1] This matter has been thoroughly briefed and the court finds it to be suitable for determination without oral argument. *See* Civ. L.R. 7-1(b).

United States District Court
Northern District of California

1   At the outset, the court will note that the parties have expended considerable energy in
2   needlessly objecting to various portions of the evidence provided by the other party – declarations
3   and exhibits – on grounds such as hearsay, relevance, the danger of unfair prejudice,
4   authentication, and reliability under F.R.E. 702. *See* Resp't Br. (dkt. 44) at 10-11; Pet.'s Br. (dkt.
5   48) at 11; and, Resp't Reply Br. (dkt. 51) at 4-8. These objections are needless because the court
6   finds that it is not easily mislead or confused, and also because it is quite well established that "the
7   Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings." *Disney*
8   *Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016) (evidentiary issues
9   in this context go to the weight of the evidence rather than its admissibility), *aff'd*, 869 F.3d 848
10  (9th Cir. 2017); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (a preliminary
11  injunction is customarily granted on the basis of procedures that are less formal and evidence that
12  is less complete than in a trial on the merits"); *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt.,*
13  *Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir.
14  2009) ("A district court may [] consider hearsay in deciding whether to issue a preliminary
15  injunction."); *Sega Enterprise Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1530 n.10 (9th Cir. 1992)
16  ("In the absence of any evidence that Nagashima was lying, it was not an abuse of discretion for
17  the district judge to admit his declaration and the altered Accolade cartridges as evidence. The fact
18  that neither Accolade nor the district court was able to verify Nagashima's statements affects the
19  weight to be given the statements and the proffered cartridges, not their admissibility."); *Republic*
20  *of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (observing that the rules of
21  evidence do not strictly apply to preliminary injunction proceedings); *Flynt Distrib. Co., Inc. v.*
22  *Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction
23  necessitates a prompt determination and makes it difficult to obtain affidavits from persons who
24  would be competent to testify at trial. The trial court may give even inadmissible evidence some
25  weight, when to do so serves the purpose of preventing irreparable harm before trial."); *K-2 Ski*
26  *Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) (trial court may consider allegations in
27  verified complaint in issuing preliminary injunction). Accordingly, the parties' requests to strike
28  one another's exhibits on the basis of evidentiary objections are **DENIED** and each party's

objections to the evidence presented by the other party are **OVERRULED**. The court notes that it has considered the entirety of each party's submissions and has given each submission the appropriate weight based on the circumstances.

## BACKGROUND

Petitioner's background was narrated in greater detail in the court's previous order granting the TRO, *see* (dkt. 31) at 1-4, however, for present purposes, the court will recapitulate a brief summary. Born in El Salvador in 1992, Petitioner entered the United States in 2014 seeking asylum after members of a criminal syndicate known as the 18th Street gang, or Mara 18, attempted to kill him after labeling him as an informer for having testified against them after they shot his stepfather in his presence. *See* Pet. (dkt. 1) at 7-8. Prior to those events, Petitioner's childhood was no less turbulent as it was marked with severe beatings and other forms of abuse from his mother, as well as sexual abuse by his mother's friends. *Id*. at 8. Due to the ubiquitous presence of this particular criminal syndicate in his home country, and his fear of continued persecution, Petitioner escaped the violence of his homeland and came to the United States in search of asylum in early 2014. *Id*. Once here, and having developed an alcohol dependency as a means of attempting to dull the pain of his trauma, Petitioner was convicted twice for public intoxication, once for an episode of domestic violence, and once for going to his wife's home in violation of a protective order. *Id*. at 9. In January of 2016, Petitioner was given a cumulative time-served sentence of 65 days in jail for all of these offenses. *Id*. Thereafter, he was transferred to immigration custody, under which he was kept in an incarcerated state for more than four years until this court's granting of his TRO application resulted in his release. *See id*. at 2, 9.

During his four years of incarceration by immigration authorities, his asylum case was mired in the government's administrative tribunals, repeatedly bouncing back and forth between the dockets of several immigration judges and the Board of Immigration Appeals ("BIA"). *Id*. at 10-14. On three occasions between 2017 and 2020, the BIA remanded Petitioner's case due to legal errors committed by various immigration judges (see *id*. at 12-13); and, during that four-year period, his repeated requests for release from jail custody were denied because the government's administrative tribunals considered him to be a flight risk as well as a danger to the community

3

1    due to his 2016 convictions for public intoxication, domestic violence, and the violation of an

2    order prohibiting him from visiting his wife's home. *Id*. at 10-14.

3          The history of abuse and violence that Petitioner suffered in his childhood years, as well as

4    the attempts on his life and that of his stepfather, resulted in his diagnosis with a severe and

5    chronic case of posttraumatic stress disorder ("PTSD"); additionally, four years of protracted

6    incarceration resulted in the further deterioration of his mental health such that he came to also

7    suffer from major depressive disorder with psychotic features and severe anxiety. *Id*. at 8. His

8    symptoms include flashbacks, nightmares, acute hopelessness, auditory hallucinations, panic

9    attacks, insomnia, restlessness, dramatic mood swings, pervasively negative thought content,

10   uncontrollable crying, and chronic suicidality that resulted in at least three suicide attempts while

11   in jail custody. *Id*. at 8, 15, 17. As a result of this state of affairs, several medical experts have

12   opined that Petitioner requires intensive psychiatric treatment – of the variety that is unavailable

13   for persons confined to the Yuba County Jail – such as to restore his mental health. *Id*. at 19-20.

14   Furthermore, one medical doctor opined that Petitioner's degraded state of mental and emotional

15   health – exasperated by his years spent in various jails while his immigration case has been

16   pending – has rendered him immunocompromised such that he "is particularly vulnerable to

17   COVID-19 infection and at increased risk of developing COVID-19 complications including

18   death." *See* Keller Decl. (dkt. 1-3) at 130-31 (Petitioner "suffers from prolonged and extremely

19   high levels of psychological distress . . . [placing him] at further risk of having a suppressed

20   immune system, putting him at higher risk than the general population of contracting and

21   potentially having more serious infections . . . [because] [s]tress and its link to immunosuppression

22   are well documented in the medical literature."). Accordingly, the undersigned found that granting

23   his TRO application, ordering his immediate release, and granting him the long-awaited relief

24   from the confinement which was exasperating his state of mental and emotional health was

25   warranted because Petitioner had clearly demonstrated a strong likelihood that his claim would

26   succeed on the merits, that irreparable harm was likely if a TRO would not issue, and that the

27   balance of hardships and the public interest favored his immediate release. *See Order Granting*

28   *TRO* (dkt. 31) at 5-13. Since then, for a number of reasons, including the fact that "all detainees

United States District Court
Northern District of California

1    [now] receive a bar of soap that may be replaced for free upon request," Respondents ask that this
2    court dissolve the TRO, dismiss or deny the Petition, and order the Petitioner to be jailed for
3    another indeterminate period because of the notion that his continued incarceration "would serve
4    the public interest by protecting the public from a person established to be a danger to the
5    community and by ensuring [the] Petitioner's presence at removal proceedings." *See* Resp't Br.
6    (dkt. 44) at 8. For the reasons discussed below, the court finds Respondents' arguments
7    unpersuasive.

## DISCUSSION

As mentioned previously, the standard for issuing a TRO and a preliminary injunction are the same. *See Order Granting TRO* (dkt. 31) at 4-5; *see also Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). Further, because Petitioner seeks an extraordinary remedy, this court will balance the competing claims of injury, considering the effect on each party of the granting or withholding of the requested relief, as well as giving attention to the public consequences of employing the extraordinary remedy of injunction. *Winter*, 555 U.S. at 24. Lastly, this court is required to deny injunctive relief unless the facts and law *clearly* favor Petitioner's position. *See e.g.*, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

Given that the court has already rendered this analysis based on a set of facts as they existed a little over two months ago, the court will begin its analysis by relating the parties' conceptions of the various changes in circumstances that have since taken place. Respondents present a few "supplemental facts," which they perceive as having changed the calculus in order to justify re-incarcerating Petitioner at the Yuba County Jail. *See* Resp't Br. (dkt. 44) at 3-4. First, (while conceding that the numbers fluctuate daily) Respondents note that the immigration detainee population at Yuba has been reduced from 168 to 78 prisoners, less than 38% of total capacity (*see* Resp't Br. (dkt. 44) at 3) – although, this was most likely accomplished by the granting of TROs and preliminary injunctions by various judges over the objections of ICE, including over 100 class

5

members released on bail by virtue of the relief being granted in *Zepeda-Rivas v. Jennings et al.*, Case No. 20-cv-2731-VC (N.D. Cal. 2020) (as of July 1, 2020, through 32 bail orders, 119 immigration prisoners have been admitted to bail and freed from the Yuba County Jail and the Mesa Verde Detention Center). Second, Respondents add that each Yuba County immigration detainee is now given a bar of soap, "free of charge." *Id*. As to soap dispensers in common areas, Respondents note that staff now check them to see if a refill is needed as often as twice in every 12-hour shift. *Id*. Also, Respondents note that hand sanitizer is now available for use by jail staff. *Id*. Further, the jail has now issued "two washable cloth masks" to each detainee, and posted "fliers remind[ing] detainees how to properly wear their masks." *Id*. at 4. Jail staff and ICE personnel are now required to wear masks while at the facility. *Id*. Lastly, Respondents note that some measures have been effected to achieve some degree of social distancing, such as increasing the spacing between bunk-beds to 6 feet in the housing units fashioned as dormitories with dozens of beds in one large room, and in other units with two-person cells, prisoners are no longer housed with cellmates; however, no real change has been effected as to the prisoners' use of common areas, communal bathrooms, communal showers, and communal recreational areas and facilities. *See id*. at 4. Regarding these common areas such as bathrooms and showers, Respondents tacitly concede that the best they can do is to implement measures that "encourage," rather than actually enforce, social distancing. *Id*. Further, while Respondents mention "taking the temperatures of all detainees every day in every housing unit," and while they also trumpet the notion that "there are still zero suspected cases . . . and still zero confirmed cases of COVID-19 at the YCJ," this is of little comfort due to the fact that there is no mention whatsoever of any testing being done to determine if any jail staff, ICE personnel, or any of the prisoners are testing positive for the SARS COVI-2 viral infection – Respondents' submissions are silent in this regard, meaning that there is no such testing being performed. *See generally* Resp't Br. (dkt. 44); Lind Decl. (dkt. 45); Tseng Decl., Exh. M (dkts. 46, 46-1); and Resp't Reply Br. (dkt. 51).

As to the changes of facts and circumstances on Petitioner's side of the equation, the court will begin by discussing the most significant of the changed circumstances – the fact that Petitioner is *not* incarcerated. In the time since this court ordered Respondents to release him from

what was more than four years of incarceration, there has been no suggestion that he has either endangered anyone in the community, or that ICE has lost track of him, or that there is any indication that he might not appear at future immigration proceedings. Indeed, each day that passes uneventfully, while Petitioner enjoys his freedom, serves to further undercut the government's contention that a series of petty offenses from 2016 will forever compel the conclusion that Petitioner's liberty will be attended with a perpetual risk of flight and a permanent danger to the community. Additionally, it appears that Petitioner's learned counsel in this matter will continue to represent him in his asylum case going forward. *See* Pet.'s Exh. (dkt. 53) at 2, 69. Another development that severely undermines the government's contention that Petitioner belongs in the Yuba County Jail, is the fact that ICE's sister agency, the United States Citizenship and Immigration Services, has issued Petitioner an Employment Authorization Document (generally known as an "EAD card"). *Id*. at 7, 67. The document provides that "[y]our EAD card is proof that you are allowed to work in the United States," and is renewable upon the expiration of its two-year validity period ending in May of 2022. *Id*. Thus, while one department of the United States seeks to convince this court to restore Petitioner to a state of imprisonment that bore all the hallmarks of indefinite civil incarceration while he awaits the day that an immigration judge's ruling as to his case will not be the subject of yet another remand order by the BIA, another department of the government is willing to trust Petitioner with an EAD card that grants him unfettered permission to participate in our economy. This is the sort of disconnect which seriously undermines the credibility behind the government's adamant representations that Petitioner continues to be a flight risk and a danger to the community after spending more than four years in jail following two incidents of public drunkenness, one episode of domestic violence with no suggestion of any resulting injuries, and the violation of an order not to visit his wife's home – for which he received a combined 65-day time-served sentence.

Since his release from the Yuba County Jail, ICE has fitted Petitioner with a GPS-tracking device on his ankle, as well enrolled him in ICE's Intensive Supervision Appearance Program ("ISAP"). *Id*. at 3. Additionally, the diligence of his legal team (whose pro-bono representation is greatly appreciated by this court and the public), consisting of several attorneys, in coordinating

1  Petitioner's compliance with the ever-shifting landscape (due to the pandemic) of ICE's regime of
2  check-ins and reporting appointments instills additional confidence that Petitioner will comply
3  with all conditions attending his release, and will appear at all future proceedings as directed. *See*
4  *id*. at 3-4. As to his ongoing care and treatment for his mental health issues, Petitioner was at first
5  admitted to San Francisco General Hospital for intensive inpatient treatment, and then discharged
6  and referred for continuing treatment on an outpatient basis. *Id*. at 4. Once again, due to the
7  diligence and skill of his counsel, "more than a half-a-dozen mental health [care] providers" were
8  arranged such that Petitioner can "obtain the ongoing medical and mental health care he needs."
9  *Id*. at 4-5. Accordingly, Petitioner's attorneys have arranged for him to receive treatment from the
10 following providers: Hillary Foster, Ph.D., a clinical psychologist; Donna Pedroza, a licensed
11 clinical social worker with a specialization in working with parolees from the California
12 Department of Corrections and Rehabilitation; Kissanet Taffere and other clinicians at the
13 Partnerships for Trauma Recovery, an organization that provides culturally-aware and trauma-
14 informed mental health care to asylum seekers and other survivors of trauma; counselors at La
15 Familia Counseling, an organization specializing in the provision of mental health and substance
16 abuse recovery services to the Spanish-speaking community; various medical psychiatric
17 evaluations and appointments at San Francisco General Hospital, Lifelong Urgent Care, and La
18 Clinica de la Raza; and, Luis Retta, a case manager at Migrant Clinicians Network, providing case
19 management and referral services to immigrants. *Id*. at 5-7. Additionally, Petitioner himself has
20 sought out peer-support through a recovery group (focused on a group therapeutic approach to
21 help those with a history of alcohol abuse) called Grupos Sicoterapia del Doctor Ayala, as well as
22 seeking out ongoing moral and spiritual support by attending several meetings with Pastor Allison
23 Tanner of the Lakeshore Avenue Baptist Church in Oakland, California. *Id*. at 7.
24     Petitioner's clinicians at Partnerships for Trauma Recovery have noted that he "is
25 experiencing lasting psychological and emotional consequences arising out of the extensive
26 trauma he has endured; the ongoing uncertainty he faces; and the grief he experiences over the
27 death of his brother and being separated from his family . . . [and] [t]he consequences of these
28 multiple traumas would likely be gravely exasperated if he were to be returned to immigration

detention." *Id*. at 11. Specifically, his clinicians note that "a return to detention could result in another, more lethal suicide attempt that might well result in [his] death." *Id*. In short, his treatment providers at Partnerships for Trauma Recovery – Kissanet Taffere, MSW, and Annika Sridharan, Psy.D. – have opined that due to Petitioner's history of severe trauma, his repeated attempts to take his own life while in detention, and his fragile psychological state, "a return to detention would be tantamount to a death sentence." *Id*. at 12-13. In this same vein, Petitioner's clinical social worker, Donna Reimann Pedroza, LCSW, meets with him twice a week to provide supportive therapy in relation to his anxiety and panic attacks which are rooted in his history of trauma, "including being shot and having family members murdered." *Id*. at 15. LCSW Pedroza notes that she "will continue to work with him as he remains in the community . . . [and] that [he] requires continued and ongoing mental health treatment for the foreseeable future," without which there is cause to be concerned for his health and safety. *Id*. at 16.

The record also contains a follow-up report from Hillary Foster, Ph.D., the psychotherapist who previously performed Petitioner's comprehensive psychological evaluation while he was still in custody – since his release, Dr. Foster has effected a number of follow-up evaluations and therapy sessions by phone. *See id*. at 28-35. Incidentally, the government contends that Dr. Foster's opinions "are not reliable and should be stricken," because, *inter alia*, the follow-up evaluations took place by telephone and Dr. Foster was unable to observe Petitioner's body language and eye-contact. *See* Resp't Reply Br. (dkt. 51) at 4-5. Respondents contentions in this regard are unpersuasive and merit no discussion. In any event, following a detailed recitation of her conversations with Petitioner's counsel regarding the bevy of treatment providers attending to Petitioner's course of mental health treatment, as well as the descriptions of a series of her own clinical observations and the administration of a number of diagnostic instruments, Dr. Foster noted that major depressive disorder and PTSD "are still the appropriate diagnoses . . . [and] that his improved state of mind is due to his increased physical and psychological safety . . . [but that] his emotional state remains extremely fragile [and] [a]ny gains he has made would be reversed should he be returned to detention [and that] it is very likely he would make another suicide attempt shortly thereafter." *See* Pet.'s Exh. (dkt. 53) at 29-33. Given that she had previously found

that while imprisoned, Petitioner "was at the edge of his capacity to emotionally survive while in detention," Dr. Foster reiterated her belief that "it is unlikely that he would survive detention again." *Id*. at 33-34. Her treatment recommendation was simple: "[He] needs to continue to remain in the community for his mental and medical wellbeing. In addition to accepted clinical practice and common sense, there is robust research showing that trauma treatment is ineffective when the person is currently living in a traumatic situation . . . One cannot heal from trauma while continually being traumatized." *Id*. at 34.

Petitioner has also included a letter from Rohini J. Haar, M.D., M.P.H., an attending physician for the Department of Emergency Medicine at Kaiser Hospital in Oakland, and a lecturer and research fellow at the University of California, Berkeley School of Public Health. *Id*. at 37. Dr. Haar's letter states that she has both met personally with Petitioner and has also reviewed his medical records and psychological reports, all of which caused her to form the opinion that Petitioner's "significant ongoing mental health issues" render him immunocompromised such that if he is exposed to SARS COVI-2, "there is a high chance that he will end up in the ICU and may not survive the infection . . . [and that] the risk of infection and psychiatric deterioration is too high to justify detaining him again." *Id*. Once again, Respondents suggest that Dr. Haar's opinion should be stricken as hearsay because "[t]his letter is unsworn," and, alternatively, that the letter should be stricken under F.R.E. 702 as unreliable because Dr. Haar "has not shown he (sic) is qualified to opine on Petitioner's psychiatric and mental health condition." *See* Resp't Reply Br. (dkt. 51) at 6. As discussed above, the rules of evidence are relaxed in the preliminary injunction context; further, there is no merit to Respondents' contention that a licensed physician is unqualified to render an opinion as to a person's mental health condition.

Petitioner has also included a second declaration by Allen S. Keller, M.D., an attending physician in internal medicine at Bellevue Hospital in New York, as well as an Associate Professor at the New York University School of Medicine. *See* Pet.'s Exh. (dkt. 53) at 71-83. Dr. Keller's opinion that Petitioner "remains particularly vulnerable to COVID-19" if he is returned to custodial confinement at the Yuba County Jail is based on his review of the documents filed on the

10

docket of this case, as well as ICE's National Detention Standards, ICE's COVID-19 Guidance, ICE's National Detainee Handbook, the CDC Coronavirus Guidelines, as well as a bevy of current scholarly literature on the COVID-19 pandemic. *Id.* at 71-72. Dr. Keller's declaration begins by relating that the virus is transmitted in a number of ways through respiratory droplets that can enter the body through the mouth, nose, and eyes, and which can survive on surfaces for hours or days. *Id.* at 73.[2] Dr. Keller also notes that infected individuals may not develop any symptoms at all, remaining unaware that they are infected, but remaining nonetheless highly contagious. *Id.*[3] While certain health conditions render a person more susceptible to contracting COVID-19, Dr. Keller clarifies that "previously healthy individuals can and are dying from COVID." *Id.* at 74. Prisoners – being congregate populations – are believed to occupy a particularly high risk of developing and transmitting COVID-19. *Id.* In fact, "[d]etention facilities, jails, and prisons have become the site of the largest outbreaks of COVID-19 outside hospitals." *Id.* Dr. Keller submits that this is so because imprisoned and detained populations live in close quarters and poorly ventilated spaces where practicing social distancing is often impossible due to the sharing of facilities such as sinks, toilets, showers, and exercise equipment without disinfection between use. *Id.*

Lastly, Dr. Keller adds that Petitioner's vulnerability to developing COVID-19 is heightened due to the fact that his underlying psychiatric conditions – depression, PTSD, and alcohol dependency – mean that he is likely immunocompromised and that "he is particularly vulnerable not only to contracting COVID-19 infection, but to developing severe COVID-related

---

[2] The court will note at this juncture that the fact that SARS COVI-2 can enter the body through the eyes, as well as the nose and mouth, in combination with the fact that the virus can survive on surfaces for days, leads to the inescapable conclusion that the Yuba County Jail's distribution of washable cloth masks meant to cover the mouth and nose – without distributing gloves and eye-protection – constitutes an incomplete approach to defending jail prisoners from infection in light of the fact that Yuba County prisoners are made to share exercise equipment, as well as sharing bathroom and shower facilities.

[3] It should not go without mention here, since it is undisputed that one may be highly contagious while showing no symptoms at all, that Respondents' failure to implement a testing regimen for prisoners and staff for viral infection while trumpeting the fact that they are "taking the temperatures of all detainees every day in every housing unit," (*see* Resp't Br. (dkt. 44) at 3) is another manifestation of an incomplete approach to curtailing the spread of the virus.

11

complications including death." *Id*. at 75.[4] Quite apart from COVID-19, Dr. Keller also notes that due to Petitioner's underlying psychiatric illnesses and fragile emotional state, returning him to immigration detention would be independently "dangerous to his mental health and well-being." *Id*. Having reviewed Respondents' briefing in this case, Dr. Keller opined that the safety precautions implemented in the Yuba County Jail are "woefully and dangerously inadequate." *Id*. at 77. Given the fact that the Yuba County Jail is not testing prisoners and staff for SARS COVI-2 infection, Dr. Keller suggests that "[t]he likelihood that infected detainees at YCJ are not being identified is further increased by the fact that a substantial portion of COVID infected individuals are asymptomatic . . . [t]hat this lack of testing continues even as public testing ramps up is a matter of concern . . . [i]t is unclear why the facility is doing this[,] [a]s such, it is highly likely that the number of detainees currently infected, at risk of becoming sick and still contagious for COVID is much higher than we may think." *Id*. at 78. Dr. Keller then adds that in jails and prisons where authorities have chosen to implement "widespread PCR testing (of both symptomatic and asymptomatic individuals), the results have been that a significant percentage – at times a majority – of the population has COVID-19." *Id*. at 78-79. At bottom, Dr. Keller notes that in congregate settings such as jails and cruise ships, "no realistic amount of social distancing, disinfection, and other preventive measures can render the level of risk equal to that of being in an individual's home . . . [because] it only takes one immigrant detainee or guard with a high viral load, who is asymptomatic[,] to unknowingly spread the virus." *Id*. at 79-80.

Additionally, Petitioner has secured a sworn declaration from another immigration detainee who was released from the Yuba County Jail on May 26, 2020. *See id*. at 261-68. Therein, it was noted that each of the jail's units (or "pods") contained common areas that were shared and in which social distancing was unrealistic due to the placement of the phones, television, tables, and benches. *Id*. at 262-63. During "program time," all inmates were expected to line up to use the showers, to receive their meal trays, to use the fixed bars for pull-ups and dips in

---

[4] *See also id*. at 76 ("There is increasing scientific understanding of the ways in which psychiatric disorders are also closely tied to the somatic, or physical, systems of the body.") (citing Gretchen N. Neigh & Fariya F. Ali, *Co-Morbidity of PTSD and Immune System Dysfunction: Opportunities for Treatment*, 29 Curr. Opin. Phamacol. 104 (2016)).

close proximity to one another and without any disinfecting between uses. *Id*. Specifically, the exercise area containing the fixed bars for body-weight exercises – an area measuring 3 feet by 5 feet – was often crowded with 8 or more people who were exercising at the same time without any cleaning or disinfecting of the equipment between use. *Id*. at 263, 267. Also, when meal time and program time would overlap, it was impossible to exercise social distancing in the common areas of the jail because prisoners would eat at shared tables and would be forced to sit close to one another in order to watch television. *Id*. Given that the exercise yard was on the roof of the jail, prisoners were often crammed tightly into an elevator such that there would be 12 or more prisoners in the elevator at a time while a number of the detainees would either not wear their masks or would wear them improperly covering their mouth but not their nose. *Id*. at 263-64. As to the masks themselves, they were "homemade masks . . . [that were] all different sizes and designs and made of different material . . . [and] [s]ometimes people had masks that were too small and did not cover down to their chin, or masks that were too big and slipped off their nose." *Id*. Consequently, most of the detainees did not wear their masks most of the time, and enforcement was lax. *Id*. at 264. Finally, Petitioner has included a letter, authored by 18 members of the United States Senate, and addressed to the acting secretary of DHS, in which the senators requested that DHS cease its practice of shuffling individuals across its network of 200 detention facilities because, as of the end of May, ICE had only tested 10 percent of the 25,911 detainees in its custody, and "[o]f the tests conducted, approximately, 50% have been positive." *Id*. at 329-30.

Despite all this, Respondents persist in their argument that Petitioner is unlikely to succeed on the merits of Claim-2[5] due to the newly implemented remedial measures, namely, the free bar of soap, the newly created 6-foot space between bunk-beds, and the washable cloth masks

---

[5] By way of summary, the Petition at bar contains three claims for relief: Claim-1 argues that Petitioner's release from immigration detention is required by Section 504 of the Rehabilitation Act of 1973 because his serious mental health conditions have caused him to suffer unequal access to the program of immigration adjudications and because ICE's continued confinement has been documented as aggravating his mental disabilities; Claim-2 argues that in light of the COVID-19 pandemic and his immunocompromised status, his continued civil detention constitutes unlawful punishment in violation of due process; and, Claim-3 argues that Petitioner's prolonged detention (in excess of four years before his release was ordered by this court on April 29, 2020) was unjustified and violated due process. *See* Pet. (dkt. 1) at 42-43.

13

described above. Resp't Br. (dkt. 44) at 5. Hence, Respondents contend that "even if Petitioner is immunocompromised . . . the precautions taken at YCJ mitigate Petitioner's risk and achieve a reasonable balance between his health and safety and Respondent's interest in detention . . . based on an immigration judge's finding, affirmed by the Board of Immigration Appeals [], that Petitioner was established to be a danger to the community and a flight risk." *Id*. at 6. Consequently, Respondents suggest that Petitioner's "detention would not be excessive in relation to its purpose of protecting the community and ensuring Petitioner is present for removal proceedings . . . [and that] detention is appropriate in light of the new evidence and updated circumstances at YCJ." *Id*. Further, Respondents appear to argue that the fact that they have been compelled by the courts of this district to release dozens of prisoners from immigration custody at the Yuba County Jail *itself* justifies repopulating that same jail with those same persons – including the Petitioner at bar. *Id*. at 7. Therefore, Respondents submit that "[t]he [subsequent remedial] measures have been effective, resulting in zero confirmed or suspected cases of COVID-19 at YCJ." *Id*. However, this is a hollow assurance. Given that Respondents are not performing any testing of persons inside the Yuba County Jail, it is easy to proclaim that there have been zero "confirmed" cases – because testing is the only means of confirmation. Next, and relying on the same evidence of subsequent remedial measures, Respondents contend that Petitioner can no longer make a showing as to a likelihood of irreparable harm if he were returned to custodial confinement at the Yuba County Jail because persons imprisoned there can now "engage in social distancing, have been issued washable cloth masks, and can frequently wash their hands" with their free bars of soap. *Id*. at 8. As to the balancing of the respective interests, Respondents simply repeat that "Petitioner's detention would serve the public interest by protecting the public from a person established to be a danger to the community and by ensuring Petitioner's presence at removal proceedings." *Id*.

The court rejects all of Respondents' arguments. With regards to the balancing of the parties' respective interests, as well as the interests of the public, based on the above-described evidence, it appears highly likely that Petitioner's mental health conditions would be so aggravated by any continued detention that the clear result would be his untimely death by either

14

suicide or COVID-related complications. Respondents overlook the crucial fact that ensuring Petitioner's presence at his future immigration proceedings *includes* taking reasonable measures to ensure his survival. Furthermore, Respondents grossly mischaracterize Petitioner's four-year-old history of a handful of minor offenses when referring to him as, "a person established to be a danger to the community," in that two episodes of public drunkenness, one episode of a domestic disturbance, and one instance of going to his wife's home in violation of a court order (for which he received a cumulative time-served sentence of 65-days) could not conceivably justify keeping him in jail for years on end while the administrative tribunals of the Department of Justice repeatedly bounce his asylum case back and forth between their various levels of review with no end in sight. Thus, as was the case before, the court now finds again that the balancing of the parties' respective interests, as well as the interests of the public, overwhelmingly weigh in favor of Petitioner's continued release. As to irreparable harm, based on the above-discussed evidence, it appears highly likely that the combination of the Petitioner's immunocompromised state and the inadequacy of the protective measures taken by Respondents at the Yuba County Jail would cause him to develop serious, and perhaps fatal, complications if he were to become infected with SARS COVI-2 and develop COVID-19. Furthermore, the record is also teeming with credible and reliable evidence that Petitioner's mental health conditions were so aggravated by the four years he spent in Respondents' custody, that if he were readmitted to jail his next suicide attempt would likely succeed. In short, Petitioner has clearly shown a high degree of likelihood that he would suffer irreparable harm if the court did not enjoin Respondents from continuing to jail him during the pendency of his asylum case. Lastly, on the basis of the above-discussed evidence, the court finds that Petitioner has clearly demonstrated a high degree of likelihood of success on the merits of Claim-2. Accordingly, an injunction will issue on the same terms and conditions attending the court's previously imposed TRO.

       The only matter that still needs to be addressed is the parties' respective positions regarding the final disposition of the habeas corpus petition at the heart of this case. Respondents contend, based on their now-rejected arguments, that the court should dismiss or deny each of the three claims articulated in the Petition. *See* Resp't Br. (dkt. 44) at 9-10. By the same token,

Petitioner contends that his petition should be granted for the same reasons articulated in his arguments as to why he is likely to succeed on the merits of his claims. *See* Pet.'s Br. (dkt. 48) at 10-11. At this point in time, the court will adopt neither of the proposed courses of action. For the reasons discussed above, as well as those expounded in the court's previous order granting the motion for a TRO, Respondent's request to dismiss or deny the Petition is **DENIED**. Given that each of the three claims articulated in the Petition seek his release from custody – i.e., relief that has already been (for the time being) secured – Claim-1 and Claim-3 were rendered unripe for adjudication by the issuance of the TRO and its conversion into a preliminary injunction. Accordingly, Claim-1 and Claim-3 are herewith **STAYED** until such time that the factual landscape changes such as to render those claims once again ripe for adjudication (e.g., the development of a vaccine or an effective and widely available treatment for COVID-19, or the final resolution of Petitioner's asylum case, or the implementation of such meaningful changes in Respondents' custodial arrangements as would address all of the concerns for Petitioner's safety and wellbeing described herein). In the event that there is such a change to the factual landscape underlying Claim-2 – that is, developments that would change the calculus on which this decision rests – the parties are **ORDERED** to promptly inform the court through a jointly-filed status report. In the meantime, for the reasons stated above, as well as those stated in the court's previous order issuing a TRO, Petitioner's request for a preliminary injunction is **GRANTED**. Respondents and all of their officers, agents, employees, servants, and attorneys are **ORDERED** during the pendency of this case to maintain the status quo.

**IT IS SO ORDERED.**

Dated: July 6, 2020

ROBERT M. ILLMAN
United States Magistrate Judge